WALTER P. CHAPMAN, PETITIONER-APPELLEE, v. ATLANTIC TRANSPORTATION CO., RESPONDENT-APPELLANT.

Essex County Court
Law Division

Decided January 4, 1952.

*Mr. Carl Gelman (Mr. Aaron Gordon* appearing), attorney for petitioner-appellee.

*Messrs. Shaw, Hughes & Pindar (Mr. Robert Shaw* appearing). attorney for respondent-appellant.

CONLON, J. C. C. This is an appeal from a determination by the Division of Workmen's Compensation in favor of the petitioner. The award totaled something over $12,000. Excepting that the case may establish a precedent for a claim for compensation on the basis of "carbon-monoxide poisoning," it is not clear why the record is as extensive as it is. It may be that simulated claims for compensation due to such poisoning involve serious implications to employers since no similar case has been called to our attention. Although the record comprises some 1,150 pages, the factual situation is not involved and may be fairly summarized by the following findings:

The petitioner is 43 years old and has been employed by the respondent as a bus driver for approximately 23 years. On March 29, 1949, he underwent a complete examination to determine his physical qualifications for this position, the result of which revealed he was normal and enjoying good health. On June 27, 1949, a warm and humid day with the temperature ranging between approximately 80 and 90 degrees, the petitioner started on his usual run from Allwood, New Jersey, to New York City. He first noticed fumes in the bus in Nutley, New Jersey, when the bus backfired. His head began to ache and the pain grew in intensity until he reached the Lincoln Tunnel where he stopped to pay a toll fare. Until this time all the windows of the bus had been closed, but in order to pay the toll it was necessary to open the window. Despite the fact that he "got a breath of air" and felt better, he closed the window after paying the fare. He continued into the tunnel and while going through, fumes continued to come up at him "from the front" of the bus "right up into my face." His headache became "terrific." After discharging the last passenger at 41st Street and 8th Avenue in New York City, he continued to his destination, the Greyhound Terminal at 50th Street, where he suffered acute nausea. He was taken to St. Claire's Hospital in a virtual state of collapse. There, Dr. Dragan, the admitting physician, diagnosed the case as "acute gas poisoning, ex-

haust." His final diagnosis, upon discharge on July 5, 1949, was "carbon monoxide poisoning." After experiencing several months of periodic dizzy spells, severe headaches and nausea, and periods of confusion and loss of vision, for which he was treated by Dr. Allen, his family physician, he was sent to the Passaic General Hospital for four or five weeks. During this time Dr. Somberg saw the petitioner and on February 14, 1950, after conducting a pneumo-encephalogram, analyzed the results as suggesting "definite organic cerebral disease," but due to the temporary relief which was brought about by this procedure it was "decided to discharge the patient and keep him under observation." Since the neurological symptoms persisted, Dr. Somberg had the petitioner admitted to the Crippled Children's Hospital in Newark, in April, 1950, at which time he performed a bilateral trephine, which is the making of a hole in the skull on both sides, and an analysis of the soft tissues of the dura. The results of this operation led to the following conclusions by Dr. Somberg:

1. That the petitioner "has an extensive cerebral atrophy following an episode of anoxia" (which is inadequate oxygen to a given part of the body, in this case the brain) suffered on June 27, 1949;

2. That the petitioner, as a result of this episode, is "100% totally and permanently disabled"; and

3. That he "will continue to go down hill."

Although some relief was obtained by Dr. Somberg's operation, the petitioner still has the same complaints referred to above, and has not returned to work since June 27, 1949.

The respondent maintains that the judgment below is erroneous because the petitioner has failed to show (a) that there was an accident, and (b) that his alleged disability is causally related to his employment.

The respondent's first contention is that there was no accident, i. e., that the petitioner's claim that he was overcome by fumes was entirely fictitious. To substantiate this contention the respondent produced witnesses who operated

the bus after the incident in question and expert witnesses who testified to the technical construction of the bus. These witnesses all testified that the bus did not and could not have exuded the fumes complained of by the petitioner. There was no witness produced who was in the bus on the trip from Nutley to New York. This evidence was entirely negative and was belied by the facts established on behalf of the petitioner, to wit, that he had been a bus operator for many years with an excellent record; that he was enjoying good health; that he collapsed with an attack from carbon monoxide poisoning within a period of some 45 minutes between the time he left Nutley and arrived in New York. To give credence to respondent's contention it would necessarily follow that the collapse of the petitioner was without any external cause and further, that his immediate reaction in attributing his seizure to the fumes was entirely simulated. The mere statement of those premises reveals their fallacy. The collapse of the petitioner must have been the result of some unnatural cause and the medical testimony adduced on his behalf attributes his seizure to a "cerebral atrophy following an episode of 'anoxia' caused by the inordinate inhalation of carbon monoxide."

The major premise of respondent's argument concerning causal relationship is founded on the contention that the physical impairment alleged to have been suffered by the petitioner is medically impossible. In furtherance of this argument respondent relies on the opinion of Dr. Yaguda. He testified as a result of two examinations, one on August 9, 1949 (before the bilateral trephine operation of April, 1950) and the other on June 28, 1950. His examination comprises some 50 pages of the record but may be summarized in a few words. On neither of his examinations did he find the petitioner suffering from any disease and in any case he could not have been afflicted with carbon monoxide poisoning.

Again the respondent's evidence is entirely negative and is completely overcome by the facts adduced. Immediately upon his admission to St. Claire's Hospital on the date in

question (June 27, 1949) the petitioner's condition was attributed by the attending physician to monoxide poisoning. Dr. Yaguda's opinion that the seizure for which he was treated at St. Claire's Hospital in New York immediately following the attack was the result of a "heat reaction" and not carbon monoxide poisoning, is not persuasive and cannot be given weight in view of the testimony of Dr. Somberg, who in April, 1950, in an effort to relieve the petitioner's acute suffering and in order to explore a diagnosis, performed the bilateral trephine. That operation involved the making of holes in both sides of the skull and an analysis of the soft tissue of the dura. It led Dr. Somberg to the conclusion that the petitioner was suffering from "an extensive cerebral atrophy following an episode of anoxia." Dr. Somberg attributed the damage to the brain to the anoxia experienced on the date of the accident.

Based solely upon the evidence before it this court is convinced that the petitioner has established by the greater probability that his permanent disability resulted from an accident arising during and out of his employment.

The other contentions of the respondent are without merit. The evidence shows that it had ample notice of the accident, and the Division's finding that the accident was initiated in this State was justified. The respondent further objected to the admission into evidence of the records of the Passaic General Hospital and the Hospital for Crippled Children. Suffice it to say the conclusions herein reached would not be altered by the elimination of that testimony.

The determination of the Division is affirmed and judgment accordingly will be entered on notice fixing fees.